**OFFISS, INC. v. FIRST UNION NAT'L BANK**

[150 N.C. App. 356 (2002)]

OFFISS, INC., Plaintiff-Appellant v. FIRST UNION NATIONAL BANK,
Defendant-Appellee

FIRST UNION NATIONAL BANK, Third-Party Plaintiff v. TAX-FREE INCOME
TRUST s/h/a TAX-FREE HIGH YIELD PORTFOLIO, Third-Party Defendant

No. COA01-620

(Filed 21 May 2002)

1. **Mortgages and Deeds of Trust— public bonds for golf course—reserve fund—foreclosure—entitlement to fund**

   The discharge of an Indenture did not result in plaintiff being entitled to a Reserve Fund where revenue bonds were issued by plaintiff to build a public golf course; an Indenture was issued to facilitate issuance of the bonds, with First Union serving as trustee; financial difficulties and a restructuring ensued, with First Union now holding a security interest in revenues including a Reserve Fund; default and foreclosure followed, with the entire amount of the secured obligation being satisfied; the purchaser of the golf course (the Bondholder) eventually sold the property and directed First Union to disburse to it all remaining funds; and plaintiff demanded payment of the Reserve Fund. Plaintiff could acquire an ownership interest in the Reserve Fund only if it satisfied the conditions set forth in the Indenture and therefore had only a contingent interest in the Reserve Fund.

2. **Mortgages and Deeds of Trust— public bonds for golf course—reserve fund—foreclosure—payment of obligation by bondholder**

   The trial court properly determined that plaintiff was not entitled to a Reserve Fund under an Indenture where the Fund was created as a part of revenue bond financing for a public golf course, the entire amount of the secured obligation was satisfied by a credit bid at foreclosure and plaintiff contended that it was entitled to the Reserve Fund because the obligations had been satisfied. The Indenture agreement was that plaintiff would be entitled to the Reserve Fund only if it "paid" or "caused to be paid" the principal and interest; a scenario in which plaintiff could default on its obligations, have the bondholder make a credit bid at foreclosure, and yet remain entitled to the balance in the Reserve Fund would contradict the purpose for which the Reserve Fund was created.

Appeal by plaintiff from judgment entered 26 January 2001 by Judge Robert P. Johnston in Mecklenburg County Superior Court. Heard in the Court of Appeals 13 February 2002.

*Rayburn Cooper & Durham, P.A., by G. Kirkland Hardymon, for plaintiff-appellant.*

*Robinson, Bradshaw & Hinson, P.A., by David M. Schilli, for defendant-appellee/third-party plaintiff-appellee.*

*Moore & Van Allen, PLLC, by Jeffrey J. Davis; and Dorsey & Whitney, LLP, by Patrick J. McLaughlin, for third-party defendant-appellee.*

WALKER, Judge.

Plaintiff OFFISS, Inc. (OFFISS) initiated this action on 1 October 1999 against defendant First Union National Bank (First Union) asserting claims for conversion, breach of fiduciary duty, negligence, breach of contract, and unfair and deceptive trade practices.[1] First Union answered denying liability and asserting affirmative defenses of waiver, estoppel, and laches. First Union also filed a third-party complaint against Tax-Free High Yield Portfolio (the Bondholder) seeking indemnification for any judgments entered in favor of OFFISS against First Union. Thereafter, the parties agreed to a trial upon a stipulated statement of facts and exhibits. On 26 January 2001, after hearing arguments and reviewing the record, the trial court entered judgment in favor of First Union and dismissed OFFISS' complaint with prejudice.

This case involves a revenue bond financing transaction. OFFISS is a non-profit corporation with its stated purpose being to oversee the development and funding of programs designed to "improve, develop, and integrate human services, economic development, education and leadership" in Swain County. On 17 March 1994, OFFISS issued what were designated "Recreational Facilities Gross Revenue Bonds (Smoky Mountain Golf Course)" to finance the acquisition, development and construction of a public golf course facility near Bryson City (the Project). The bonds had a principal amount of $5,695,000.00 and were purchased by the Bondholder. To facilitate the issuing of the bonds, OFFISS executed an Indenture of Trust with

---

1. OFFISS also asserted claims for an accounting and the imposition of a constructive trust but subsequently waived these claims.

First Union under which First Union served as trustee of various "property, franchises and income" related to the bonds and the Project for the benefit of the Bondholder.

Over the next two years, the Project experienced financial difficulty such that OFFISS was unable to service its bond obligations. To avoid a default and to provide additional funds to complete the Project, the parties agreed to restructure the bonds. In February 1996, OFFISS re-issued the bonds at a principal amount of $5,484,738.25 and issued additional bonds in the principal amount of $2,066,449.10 for an aggregate total of $7,551,187.35 (the Bonds). The Bonds carried an interest of 8.4 percent per annum and the Bondholder purchased them for $7,633,863.43.

The Bonds were issued pursuant to an Amended And Restated Indenture of Trust (Indenture) executed by OFFISS and First Union. The Indenture again named First Union as trustee of various "property, franchises and income" related to the Bonds and the Project for the benefit of the Bondholder.

To provide security for the repayment of the Bonds, OFFISS granted to First Union within the Indenture a security interest in the "Revenues" as defined by the Indenture. OFFISS also executed a "Deed of Trust and Security Agreement" (Deed of Trust). Pursuant to the Deed of Trust, OFFISS conveyed the property on which the golf course was being built (Mortgaged Property) to a Deed of Trust Trustee for the benefit of First Union as the trustee under the Indenture. The Deed of Trust authorized the Deed of Trust Trustee to foreclose on the Mortgaged Property through a power of sale if: (a) an "event of default" occurred under the Bonds, (b) the maturities on the Bonds were accelerated pursuant to the terms of the Indenture, and (c) First Union, as beneficiary, so directed the trustee. Finally, the Deed of Trust also granted to First Union a security interest in certain "collateral" associated with the Project (Deed of Trust Collateral).

In accordance with the Indenture, certain funds were created and maintained by First Union. One of these funds was designated as "The Smoky Mountain Golf Course Reserve Fund" (Reserve Fund). Money deposited into this fund was to be withdrawn and used by First Union pursuant to the terms of the Indenture. The Indenture required that $829,500.00 of the Bond proceeds be deposited into the Reserve Fund.

**OFFISS, INC. v. FIRST UNION NAT'L BANK**

[150 N.C. App. 356 (2002)]

In 1997, OFFISS defaulted on its obligations under the Indenture when it failed to make payments of principal and interest on the Bonds. Consequently, First Union was unable to make its payments to the Bondholder when the Bonds came due. On 14 May 1998, pursuant to the Bondholder's instructions, First Union gave OFFISS notice of default, accelerated the maturities on the Bonds, and directed the Substitute Trustee[2] under the Deed of Trust to begin foreclosure proceedings. After the Substitute Trustee commenced foreclosure proceedings on the Mortgaged Property and Deed of Trust Collateral, a foreclosure sale was held on 8 July 1998. As of that date, the outstanding principal and accrued unpaid interest under the Bonds was $8,891,134.00. Prior to the foreclosure sale, the Bondholder instructed First Union to enter a credit bid of $8,900,000.00 on its behalf. First Union submitted this bid and the Bondholder became the successful bidder. Subsequently, on 31 July 1998, the Substitute Trustee conveyed to the Bondholder through a "Deed by Trustee under Foreclosure" the Mortgaged Property and the Deed of Trust Collateral. A Final Report and Account of Foreclosure Sale was filed which reported that the entire amount of the secured obligation between OFFISS and First Union had been satisfied. The cost and expenses incurred by First Union and the Substitute Trustee amounted to $76,478.31.

Meanwhile, although the golf course had been completed, it failed to generate sufficient income to pay its operating expenses. Throughout 1998, First Union, in accordance with the Indenture, disbursed funds out of the Reserve Fund to keep it operating. As a result, only $616,156.26 remained in the Reserve Fund on 31 July 1998. After that date, First Union continued to disburse funds from the Reserve Fund pursuant to instructions it received from the Bondholder.

In December 1998, the Bondholder sold the Mortgaged Property and received $464,791.47 in net proceeds. Shortly thereafter, the Bondholder directed First Union to disburse to it all remaining funds held in relation to the Bonds. Upon receipt of these funds, the Bondholder tendered the Bonds to First Union for cancellation. However, on 13 September 1999, OFFISS demanded payment from First Union, as Trustee under the Indenture, of the $616,165.26 which had been in the Reserve Fund as of 31 July 1998.

---

2. Subsequent to the execution of the Deed of Trust the parties named a Substitute Trustee to replace the Trustee.

With this appeal, OFFISS contends the trial court erred in rendering judgment in favor of First Union and dismissed its complaint. In reaching this decision, the trial court concluded in part:

> 5. First Union had a duty as trustee under the Indenture to use the Reserve Fund solely in repayment of the Bonds, and First Union satisfied its duty by disbursing the money in the Reserve Fund pursuant to the terms of Article V of the Indenture and the instructions received from the Bondholder.

> 6. The Indenture contains conditions precedent that [OFFISS] was required to satisfy before [OFFISS] acquired any right to the Reserve Fund, and [OFFISS] did not satisfy those conditions precedent and, thus, has no right to the Reserve Fund.

OFFISS argues the trial court erred in that: (1) the Indenture had been discharged as a result of the foreclosure proceedings and its terms no longer controlled who was entitled to the Reserve Fund, and (2) even if the Indenture's terms controlled, OFFISS satisfied the conditions specified in the Indenture and thus had acquired the right to the Reserve Fund.

I.

[1] OFFISS' first argument rests on its interpretation of the terms of the Indenture and the Deed of Trust. OFFISS maintains the Deed of Trust incorporated the terms of the Indenture and thereby served to secure OFFISS' repayment of the Bonds and the performance of its other obligations under the Indenture. Thus, according to OFFISS, when the Deed of Trust was foreclosed upon and the Substitute Trustee reported that the obligations secured by it had been satisfied, any remaining obligations of OFFISS under the Deed of Trust and the Indenture were discharged. As a result, the conditions specified in the Indenture were no longer applicable and First Union became obligated to disburse to OFFISS the proceeds which remained in the Reserve Fund. We disagree.

The basis of OFFISS' argument centers on its assumption that, at the time OFFISS executed the Indenture with First Union, OFFISS acquired an ownership interest in the Reserve Fund. Under this assumption, once the encumbrances on OFFISS' ownership interest were satisfied as a result of foreclosure, OFFISS became entitled to the Reserve Fund regardless of the conditions set forth in the Indenture. In support of its position, OFFISS cites *Liberty Mfg. Co. v.*

*Malloy*, 217 N.C. 666, 9 S.E.2d 403 (1940) which holds: "[t]he essential effect and consequence of the discharge of the mortgage debt is the discharge of the mortgage itself. The mortgage was incident to the debt, rested upon it, and when the purpose for which it was created was accomplished, it ceased to have effect." *Id.* at 668, 9 S.E.2d at 404. However, the case here is distinguishable in light of the fact that OFFISS never acquired an ownership interest in the Reserve Fund.

Under the Indenture's provisions, OFFISS pledged to First Union as trustee under the Indenture, the "Trust Estate,"[3] for the benefit of the Bondholder. The Trust Estate remained as pledged security under the Indenture which recited:

> PROVIDED, HOWEVER, that if [OFFISS] pays or causes to be paid all of the principal of, premium, if any, and interest due and payable on all Outstanding Bonds, pays or causes to be paid all other sums payable by [OFFISS], including all fees, expenses and other amounts payable to [First Union], . . ., then, and in that case, the right, title and interest of [First Union] in and to the Trust Estate will then cease, terminate and become void and this Indenture and the rights hereby granted shall cease, determine and be void; otherwise this Indenture to be and remain in full force and effect.

The parties agree that the Reserve Fund was included in the Trust Estate and that First Union as trustee was required to create and maintain the fund using $829,500.00 of the proceeds provided by the Bondholder. They also agree the Indenture sets forth two independent conditions, each of which needed to be fulfilled by OFFISS before it was entitled to the Reserve Fund: (1) payment of all of the principal and interest due on the Bonds, and (2) payment of all other sums payable by OFFISS including all fees, expenses and other amounts payable to First Union. *See Farmers Bank v. Brown Distributors*, 307 N.C. 342, 350, 298 S.E.2d 357, 362 (1983) (a condition precedent is an event which must occur before a contractual right arises). Section 5.05 of the Indenture provides:

> Trust Moneys deposited in the Reserve Fund shall be used and withdrawn by the Trustee for the purpose of paying the last maturing principal of and the interest on the Bonds, whether at the stated payment date or by redemption of the Bonds; provided, however, that whenever and to the extent that moneys in the

---

3. The Indenture defined the "Trust Estate" as "all property and rights conveyed by [OFFISS] under the Granting Clauses of [the] Indenture."

Bond Fund[4] are insufficient for the purpose of paying principal of and interest on the Bonds, whether or not at the redemption date therefor, moneys on deposit in the Reserve Fund shall be withdrawn by the Trustee and used for such purposes. . . .

Thus, the parties created the Reserve Fund and the Indenture required that it be held by First Union in trust for the general purpose of securing the payment of the principal and interest on the Bonds. OFFISS could only acquire an ownership interest in the Reserve Fund if it satisfied the conditions set forth in the Indenture. Therefore, by the terms of the Indenture, OFFISS only had a contingent interest in the Reserve Fund. *See e.g. In re Central Medical Center, Inc.*, 122 B.R. 568, 573 (Bankr. E.D. Mo. 1990) (recognizing that a reserve fund created under an indenture was not considered property of the debtor's bankruptcy estate as the debtor only had a reversionary interest in the fund). Accordingly, since OFFISS never acquired an ownership interest in the Reserve Fund, we find no merit to OFFISS' contention that the discharge of the Indenture resulted in its entitlement to the Reserve Fund.

II.

[2] OFFISS also argues that regardless of whether the terms of the Indenture controlled, it nonetheless satisfied the Indenture's two conditions and is thereby entitled to the Reserve Fund. Specifically, OFFISS maintains the conditions were met by virtue of the $8,900,000.00 credit bid the Bondholder made at foreclosure.

Regarding the first condition, OFFISS contends that since the Bondholder's credit bid of $8,900,000.00 "fully satisfied" the obligations secured by the Deed of Trust, it in effect "paid" the principal and interest due on the Bonds as required by the Indenture. In support of this position, OFFISS cites authority which it asserts concludes that a credit bid made by a secured creditor at foreclosure is the equivalent of making a cash payment. *See* 59A C.J.S. Mortgages § 634(c) (1998); *Bennett v. Morrison*, 242 P. 636, 637 (Colo. 1925); *Witter v. Bank of Milpitas*, 269 P. 614, 619 (Cal. 1928); *Pennington v. Purcell*, 125 So. 79, 82 (Miss. 1929); *Thomason v. Pacific Mut. Life Ins. Co. of California*, 74 S.W.2d 162, 164 (Tex. Civ. App.-El Paso 1934); *Somers v. Godwin*, 27 S.E.2d 909, 912 (Va. 1943); *and Semmes Nurseries, Inc. v. McDade*, 263 So.2d 127, 131 (Ala. 1972).

4. The Indenture required the creation of a Bond Fund to ensure principal and interest payments as they came due.

Notwithstanding the principle set forth in these cases, OFFISS fails to reconcile the expressed language set forth throughout the Indenture. In addition to the previously quoted provisions, Section 9.10 states in relevant part:

> Whenever the principal of, premium, if any, and interest on all of the Bonds have been paid under the provisions of this Section 9.10 and all expenses and charges of [First Union] have been paid, any balance remaining in the Funds created hereunder shall be paid to [OFFISS].

Furthermore, under Article XII:

> Any Bond will be deemed to be paid. . .for all purposes of this Indenture when. . .payment of the principal of such Bond plus interest thereon . . . has been provided for by irrevocably depositing with [First Union]. . . moneys sufficient to make such payment. . . .

Our courts have consistently held that the terms of a contract are to be interpreted according to the expressed intent of the parties unless such intent is contrary to law. *See Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622 (1973); *Duke Power Co. v. Blue Ridge Elec. Membership Corp.*, 253 N.C. 596, 117 S.E.2d 812 (1961); *Lake Mary Ltd. Part. v. Johnston*, 145 N.C. App. 525, 551 S.E.2d 546, *disc. rev. denied*, 354 N.C. 363, 557 S.E.2d 539 (2001); *and Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 518 S.E.2d 205, *disc. rev. denied*, 351 N.C. 186, 514 S.E.2d 709 (1999). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996).

Here, Section 5.05, Section 9.10, and Article XII of the Indenture each use the word "paid" in the context which would require OFFISS to make a payment or cause a payment to be made. Nonetheless, OFFISS seeks to have the word "paid" interpreted to include the satisfaction of its obligations by a credit bid in foreclosure. The interpretation OFFISS puts forth would require us to conclude the parties contemplated that OFFISS could default on its obligations, have the Bondholder make a credit bid at foreclosure, and yet remain entitled to the balance in the Reserve Fund. Such a scenario contradicts the very purpose for which the Reserve Fund was created, namely, to ensure that the Bondholder received payment of the principal and

interest on the Bonds from OFFISS. Additionally, a careful reading of the Indenture reveals that, in other sections, the parties clarified when the term "pay" was to include the satisfaction or discharge of an obligation. For example, pursuant to Section 7.13(g), OFFISS agreed to "pay or otherwise satisfy and discharge" the various obligations it made in connection with the Project. The parties stipulated that "[OFFISS] defaulted on its obligations under the Indenture by *failing to make payments* of principal and interest on the Bonds to First Union." (emphasis added).

We conclude the Indenture clearly sets forth the parties' agreement that OFFISS would only be entitled to the Reserve Fund if it "paid" or "caused to be paid" the principal and interest due under the Bonds. Since OFFISS has not fulfilled this condition, the trial court properly determined it was not entitled to the Reserve Fund. We note that our holding today does not suggest that, under similar circumstances, a credit bid at a foreclosure sale, which equals or exceeds the total outstanding principal and accrued unpaid interest under the bonds, could never constitute payment of the obligations secured by a Deed of Trust.

The judgment of the trial court dismissing OFFISS' complaint with prejudice is hereby

Affirmed.

Judges HUNTER and BRYANT concur.